UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PHARAOHS GC, INC.

                    Plaintiff,                  20-CV-665

     v.

UNITED STATES SMALL BUSINESS
ADMINISTRATION,

JOVITA CARRANZA, in her Official Capacity as
Administrator of the Small Business Administration,

UNITED STATES OF AMERICA,

STEVE MNUCHIN, in his Official Capacity as
United States Secretary of Treasury,

                    Defendants.

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION**

Dated:  June 15, 2020

JAMES P. KENNEDY, JR.
United States Attorney

MICHAEL S. CERRONE
Assistant U.S. Attorney
U.S. Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5851
michael.cerrone@usdoj.gov

## INTRODUCTION

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), appropriated to the United States Small Business Administration ("SBA") funds to provide guarantees through the Payroll Protection Program ("PPP") on private loans to small businesses harmed by the COVID-19 crisis. After the passage of the CARES Act, the SBA has continued to adhere to its pre-existing regulation, 13 C.F.R. § 120.110, that made 18 types of businesses ineligible for SBA-backed loans.[1] Among those 18 types of ineligible businesses are those "with an Associate who is incarcerated, on probation, on parole, or has been *indicted for a felony* or a crime of moral turpitude." 13 C.F.R. § 120.110(n) (emphasis added). The Government will show herein that Plaintiff – which operates an adult entertainment club in Cheektowaga, New York -- is ineligible for an SBA-backed PPP loan under § 120.110(n) because a member of Plaintiff's managerial staff is under federal indictment on a variety of drug and gun charges.

Another of the 18 types of businesses ineligible for SBA-backed loans are those engaged in selling products or services, or presenting depictions or live performances, of a "prurient sexual nature". 13 C.F.R. § 120.110(p). Plaintiff alleges it was denied a PPP loan because of SBA's application of § 120.110(p). In this action, Plaintiff seeks declaratory and injunctive relief and contends that: (i) the CARES Act, by its terms, bars application of § 120.110(p) to PPP loans; and (ii) even if the CARES Act does not bar application of § 120.110(p) to PPP loans, that regulation is unconstitutional under the First and Fifth Amendments.

In opposition to the Government's argument that 13 C.F.R. § 120.110(n) makes Plaintiff's business ineligible for a PPP loan, it is anticipated that Plaintiff will argue that the CARES Act

---

[1] Under the CARES Act, non-profit organizations, while included as an ineligible business under § 120.110(a), were specifically deemed eligible for PPP loans by Congress.

precludes application of § 120.110(n) because the CARES Act states that PPP loans are available to "any business concern." Dkt. # 3-6, pp. 4-5 (arguing that the CARES Act precludes application of § 120.110(p)). However, the core of Plaintiff's argument was rejected just a few days ago by Judge Wolford in *The Diocese of Rochester, et al. v. U.S. Small Business Admin., et al.*, Case No.: 6:20-CV-06243 EAW, 2020 WL 3071603 at * 6 (W.D.N.Y. June 10, 2020). Judge Wolford held that the language "any business concern" in the CARES Act related merely to a relaxing of the business size requirements normally applicable to SBA-backed loans and that PPP loans were still subject to other SBA regulatory restrictions not specifically addressed in the CARES Act (such as the issue of creditworthiness, as was relevant in *The Diocese of Rochester*).

Consistent with Judge Wolford's analysis, this Court should find that Plaintiff has failed to carry its burden of showing a likelihood of success on the merits as the CARES Act does not bar the applicability of § 120.110 to PPP loans; and the SBA's determination that § 120.110 applies to PPP loans is entitled to deference. Moreover, because Plaintiff is ineligible for a PPP loan under § 120.110(n), the Court should also dismiss Plaintiff's constitutional claims due to lack of standing as Plaintiff's alleged injury – an inability to obtain a PPP loan – will not be redressed even if § 120.110(p) is invalidated on constitutional grounds. Lastly, the Government will further show that Plaintiff does not have a likelihood of success on the merits of its constitutional claims and its motion should, therefore be denied.

## BACKGROUND

### A.     The Small Business Administration

The declared policy of the Small Business Act, 15 U.S.C. § 631 *et seq.*, is to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns," in order to preserve the system of free competitive enterprise that is "essential" to the economic well-

being and security of the Nation.  15 U.S.C. § 631(a).  To promote that important national objective, Congress created the SBA, under the management of a single Administrator, *id*. § 633(a), (b)(1), who is given "extraordinarily broad powers" under section 7(a) of the Act, 15 U.S.C. § 636(a), to provide a wide variety of technical, managerial, and financial assistance to small-business concerns.  *See SBA v. McClellan*, 364 U.S. 446, 447 (1960); *see generally* 15 U.S.C.  § 636(a) (describing numerous varieties of general small-business loans the Administrator is "authorized" and "empowered" to make); 13 C.F.R. § 120.1.  In the performance of these authorized functions the Administrator is further empowered to "make such rules and regulations as [she] deems necessary to carry out the authority vested in [her]," and in addition to "take any and all actions … [that] [she] determines … are necessary or desirable in making … loans."  15 U.S.C. § 634(b)(6), (7).

SBA financial assistance to a small business under section 7(a) of the Act may take the form of a direct loan, an immediate participation (joint) loan with a lender, or a deferred participation (guaranteed) loan initiated by a lender but a portion of which the SBA will purchase from the lender in the event of a borrower default.  13 C.F.R. § 120.2(a); *see Valley Nat'l Bank v. Abdnor*, 918 F.2d 128, 129 (10th Cir. 1990); *California Pac. Bank v. SBA*, 557 F.2d 218, 219 (9th Cir. 1977).  In practice, however, the SBA ordinarily guarantees loans made by private lenders rather than disbursing funds directly to borrowers, *see United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 (1979), thus "reduc[ing] risk for lenders … mak[ing] it easier for them to access capital," and thereby "mak[ing] it easier for small business to get loans."  *See https://www.sba.gov/funding-programs/loans*.

Ordinarily, to qualify for an SBA general business loan an applicant must be an operating business organized for profit that is located in the United States, 13 C.F.R. § 120.100(a)-(c); meet

the size standards for a "small" business set forth under the statute and SBA rules (usually stated in terms of number of employees, or average annual receipts), *see* 15 U.S.C. § 632(a)(2); 13 C.F.R. § 120.100(d); 13 C.F.R. Part 121; and demonstrate that the desired credit is not available elsewhere on reasonable terms, 15 U.S.C. § 632(h); 13 C.F.R. §§ 120.100(e), 120.101.   In addition, an applicant must meet SBA standards of creditworthiness, *see* 13 C.F.R. § 120.150;  and, for loans over $25,000, meet the lender's collateral requirements for similar non-SBA guaranteed loans, SBA Standard Operating Procedure ("SOP") 50-10-5(K), *Lender & Dev. Co. Loan Programs*, Subp. B, Chap. V, § II(B)(3)(b), at 193 (Appendix A hereto).   Holders of 20 percent or more ownership shares in the applicant must personally guarantee the loan.  13 C.F.R. § 120.160(a).

## B.      Ineligible Business Types Under 13 C.F.R. § 120.110

Pursuant to the broad powers conferred on the Administrator by the Small Business Act to make rules and regulations and take other actions deemed necessary or desirable in making SBA loans to small-business concerns, 15 U.S.C. § 634(b)(6), (7), the SBA over time has determined as a matter of policy that SBA business loans should not be made available to 18 different types of businesses.  13 C.F.R. § 120.110.  For example, (i) non-profit organizations, (ii) other lenders, (iii) businesses located in a foreign country; (iv) pyramid sale distribution plans; (v) certain gambling-related businesses; and (vi) businesses engaged in illegal activity are ineligible for SBA-backed loans.  13 C.F.R. § 120.110 (a), (b), (e), (f), (g), and (h).  In addition, § 120.110 deems ineligible – as is directly relevant here – (i) businesses "with an Associate who is incarcerated, on probation, on parole, or has been indicted for a felony or a crime of moral turpitude," and (ii) businesses engaged in selling products or services, or presenting depictions or live performances, of a "prurient sexual nature."  13 C.F.R. § 120.110(n), (p).

4

C.      **The CARES Act**

On March 27, 2020, the President signed into law the CARES Act, Pub. L. No. 116-136, 134 Stat. 281, passed by Congress to provide an unprecedented package of emergency economic assistance and other support to help individuals, families, businesses, and health-care providers cope with the enormous economic and public health crises—unlike any experienced in the lifetime of the Nation—triggered by the worldwide coronavirus (COVID-19) pandemic.  *See* SBA, Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck Protection Program*, 80 Fed. Reg. 20811-01, 20811-12 (Apr. 15, 2020) ("PPP Interim Final Rule") (Attached as Appendix B hereto).  Among the numerous measures taken by the CARES Act to address the COVID-19 crisis, of principal concern here is the PPP, CARES Act. § 1102, enacted to extend relief to small businesses experiencing economic hardship as a result of the public-health measures being taken to minimize the public's exposure to the COVID-19 virus.  *See* PPP Interim Final Rule, 85 Fed. Reg. at 20811.

Specifically, section 1102(a)(2) of the CARES Act adds a new paragraph (36) to section 7(a) of the Small Business Act, 15 U.S.C. § 636(a)(36), which provides that "[e]xcept as otherwise provided in this paragraph, the [SBA] may guarantee [PPP] covered loans"—not make loans directly, however—"under the same terms, conditions, and processes as a loan made under this subsection," i.e., section 7(a).  15 U.S.C. § 636(a)(36)(B).  The PPP then sets forth in extensive detail the precise ways in which PPP covered loans differ from other section 7(a) loans.  *Id*. § 636(a)(36)(D)-(R).  Among these differences, the PPP authorizes the SBA to make covered loans to various non-profit organizations, independent contractors, and self-employed individuals, as well as to small business concerns, *id*. § 636(a)(36)(D)(i), (ii); relaxes size limitations to allow businesses with as many as 500 employees (or more, depending on the industry in which they

operate) to receive assistance, *id.* § 636(a)(36)(D)(i)(I); and selectively waives certain of the SBA's affiliation rules used to make small business "size" determinations, *id.* § 636(a)(36)(D)(iv); *see* 13 C.F.R. Part 121.[2]

**D.    Businesses with an Indicted Associate Remain Ineligible for SBA-Backed Loans Under the CARES Act and the PPP**

As stated above, § 120.110(n) makes businesses "***with an Associate who*** is incarcerated, on probation, on parole, or ***has been indicted for a felony*** or a crime of moral turpitude" ineligible for SBA-backed loans.  13 C.F.R. § 120.110(n) (emphasis added).  SBA regulations define an "associate" as an  "officer, director, owner of more than 20 percent of the equity, or ***key employee of the small business***."  13 CFR § 120.10(2)(1) (emphasis added).  SBA Standard Operating Procedures ("SOP") in turn define a "key employee" as a "an employee who manages daily operations, e.g. overseeing a department or a division, not a clerical staff position."  SBA SOP 50 10 5(K), Subpart A, p. 11, ¶ (b), and p. 42, ¶ 5, Subpart B, p. 140, ¶ 2, Subpart B, p. 222, ¶ e, and Subpart B, p. 322, ¶ 4 (relevant portions of the SOP are attached as Appendix A).

In the CARES Act, Congress did not alter or amend the SBA's longstanding limitation on providing Section 7(a) loans to the ineligible businesses listed under § 120.110.[3] *See* CARES Act, § 1102(a), 134 Stat. at 287 (codified at 15 U.S.C. § 636(a)(36)(B)) (providing that Paycheck Protection Program loans are to be provided "under the same terms, conditions, and processes" as

---

[2] The PPP also expressly caps the chargeable rate of interest of a covered loan at four percent (SBA has further limited the rate to one percent), id. § 636(a)(36)(L); PPP Interim Final Rule, 85 Fed. Reg. at 20813; and waives the "no credit elsewhere," personal guarantee, collateral, and guaranteed loan fee requirements imposed under section (7)(a), SBA regulations.  15 U.S.C. § 636(a)(36)(H)-(J), (L).  The maximum amount of a PPP covered loan is the lesser of $10,000,000 or an amount calculated as a multiple of the applicant's total monthly "payroll costs," to which the balance of any outstanding disaster loans under 15 U.S.C. § 636(b)(2) may be added.  *Id.* § 636(a)(36)(E); § 636(a)(36)(A)(viii)(I); *see* PPP Interim Final Rule, 85 Fed. Reg. at 20812-13.  Section 1106 of the CARES Act provides for forgiveness of up to the full principal amount borrowed.  CARES Act § 1106(b); PPP Interim Final Rule, 85 Fed. Reg. at 20811, 20813.  The actual amount forgiven will depend on a borrower's payroll costs and payments for rent, utilities, and mortgage interest.  CARES Act § 1106(b) (1)-(4), (d); PPP Interim Final Rule, 85 Fed. Reg. at 20813.  No later than 90 days after the date on which the amount of forgiveness is determined, the SBA must remit to the lender the amount forgiven plus interest.  CARES Act § 1106(c)(3).

[3] Except non-profit organizations as has been mentioned.

other Section 7(a) loans unless otherwise specified).  Consistent with the CARES Act, the SBA's

PPP Interim Rule, 85 Fed. Reg. 73, p. 20812, ¶ 2(c) (April 15, 2020), confirms that, except for

non-profits, the businesses that are ineligible under 13 C.F.R. § 120.110 remain ineligible for SBA-

backed loans under the CARES Act and the PPP: "c. How do I determine if I am ineligible?

***Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110*** and described

further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that

nonprofit organizations authorized under the Act are eligible." (emphasis added).

**E.      Plaintiff's Manager is Under Federal Indictment**

Anthony Gerace (who is the brother of Peter Gerace, Plaintiff's owner) has been federally

indicted on a variety of felony-level drug and gun-related offenses.  Cerrone Dec., Exh. 1.  In a

motion in his criminal case to modify his release conditions, Anthony Gerace stated, through his

attorney, on February 12, 2020, that he had become employed full-time as a "restaurant manager".

Cerrone Dec., Exh. 2, ¶ 3.  In a reply affirmation on that same motion, Anthony Gerace's attorney

confirmed, on March 6, 2020, that Mr. Gerace is employed as a "kitchen manager" "at the kitchen

at Pharoah's Gentlemen's Club."  Cerrone Dec., Exh. 3, ¶ 11.[4]

**F.      Plaintiff and Its Claims**

Plaintiff is an establishment operating under the name "Pharaohs" with a principal place of

business at 999 Aero Drive, Cheektowaga, New York.  Dkt. # 1, ¶ 3.  Plaintiff engages in the

business of presenting "adult entertainment consisting of nude and semi-nude dancers."  Dkt. # 1,

---

[4] Plaintiff's business location in Cheektowaga, New York was raided by federal law enforcement in or about December 2019 pursuant to a search and seizure warrant executed by U.S. Magistrate Judge Michael J. Roemer. Cerrone Dec., Exh. 4. In the search and seizure warrant, Judge Roemer found that the Government's supporting papers "establish[ed] probable cause to search and seize" property found at Pharaohs Gentlemen's Club and "that such search will reveal … [e]vidence" of "violations of," among other criminal statutes, the Racketeer Influenced and Corrupt Organizations Act.  Cerrone Dec., Exh. 4.

¶ 4.  According to Plaintiff, none of its live performances is "unlawful or obscene."  Dkt. # 1, ¶¶ 33-34.

Plaintiff states that it "has been closed for business since 8 p.m. on March 15, 2020 and is currently shuttered" as a result of Executive Order No. 202.8 issued by New York Governor Andrew Cuomo in response to the COVID-19 pandemic.  Dkt. # 1, ¶¶ 35-36.  Plaintiff alleges that it has "suffered significant business losses but plans to reopen when legally permitted to do so."  Dkt. # 1, ¶ 37.

Despite the fact that the CARES Act was passed on March 27, 2020 and additional funds were allocated for the PPP program on April 24, 2020, Plaintiff alleges that it first applied for a PPP loan on or about May 20, 2020.  Dkt. # 3-5, ¶ 3.  After its attempts to apply for a PPP loan electronically could not be completed, Dkt. # 3-3, ¶ 5, Plaintiff submitted a paper loan application with Live Oak Bank.  Dkt. # 3-3, ¶ 6, Exh. 1.  Live Oak Bank allegedly informed Plaintiff that it could not proceed with the PPP loan application because Plaintiff is engaged in the adult entertainment business.  Dkt. # 3-3, ¶ 7; Dkt. # 3-5, ¶ 4.  Plaintiff contends that it is "fully qualified — but for [13 C.F.R. § 120.110(p)] or the SBA's application thereof— to receive a PPP loan under all relevant statutes, regulations, and procedures."  Dkt. # 1, ¶ 43.  Plaintiff's application for a PPP loan is currently "on hold."  Dkt. # 1, ¶ 45.  Plaintiff claims that, absent a PPP loan, it "may" lack the staff and/or funds to reopen following the COVID-19 pandemic, "resulting in the permanent ruination of its businesses."  Dkt. # 1, ¶ 52.

In its complaint, Plaintiff asserts five "counts": (i) in the first "count," Plaintiff contends that 13 C.F.R. 120.110 (p) constitutes an impermissible content-based restriction of speech, Dkt. # 1, ¶¶ 55-63, 58; (ii) in the second "count," Plaintiff asserts a claim under the equal protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution, Dkt. # 1,

¶¶ 64-79; (iii) in its third "count," Plaintiff seeks a declaratory judgment holding that § 120.110(p) is invalid on the theory that the SBA lacked authority under the CARES Act "to promulgate regulations [which] restricted or otherwise 'clarified' what businesses were eligible for PPP Loans in the manner the Defendants have done, to the exclusion of the Plaintiff from those benefits," Dkt. # 1, ¶ 81; (iv) in the fourth "count," Plaintiff seeks a permanent injunction, Dkt. # 1, ¶¶ 86-90; and (v) Plaintiff claims an entitlement to attorneys' fees in its fifth "count."  Dkt. # 1, ¶¶ 91-95.

<u>**ARGUMENT**</u>

<u>**POINT I**</u>

<u>**PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS STATUTORY CLAIM AS THE CARES ACT DOES NOT BAR APPLICATION OF SBA INELIGIBILITY RULES TO THE PPP, AND THE SBA'S INTERPRETATION OF THE CARES ACT IS ENTITLED TO DEFERENCE**</u>

**A.      Standard of Review on a Motion for a Preliminary Injunction**

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008), and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  A plaintiff seeking a preliminary injunction must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  The last two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Supreme Court has also admonished that a preliminary injunction cannot issue on the basis of speculative or possible injury.  Rather, the movant must establish that irreparable harm is "*likely* in the absence of an injunction."  *Winter*, 555 U.S at 22.

**B.    Plaintiff Is Ineligible For A PPP Loan Under 13 C.F.R § 120.110(n) Because Its Manager Is Under Felony Indictment**

As stated above, 13 C.F.R. § 120.110(n) makes businesses "*with an Associate who* is incarcerated, on probation, on parole, or *has been indicted for a felony* or a crime of moral turpitude" ineligible for SBA-backed loans.  13 C.F.R. § 120.110(n) (emphasis added).  SBA regulations define an "associate" as an  "officer, director, owner of more than 20 percent of the equity, or *key employee of the small business*."  13 CFR § 120.10(2)(1) (emphasis added).  SBA Standard Operating Procedures (SOP) in turn define a "key employee" as a "an employee who manages daily operations, e.g. overseeing a department or a division, not a clerical staff position." SBA SOP 50 10 5(K), Subpart A, p. 11, ¶ (b), and p. 42, ¶ 5, Subpart B, p. 140, ¶ 2, Subpart B, p. 222, ¶ e, and Subpart B, p. 322, ¶ 4 (Appendix A).

The SBA's PPP Interim Rule, 85 Fed. Reg. 73, p. 20812, ¶ 2(c) (April 15, 2020), confirms that, except for non-profits, the businesses that are ineligible under 13 C.F.R. § 120.110 remain ineligible for SBA-backed loans under the CARES Act and the PPP: "c. How do I determine if I am ineligible? *Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110* and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible." (emphasis added) (Appendix B).  Thus, businesses that were ineligible for SBA-backed loans under 13 C.F.R. § 120.110(n), because a key employee is under felony indictment, remain ineligible under the CARES Act and the PPP.

As stated above, Anthony Gerace has been federally indicted for certain drug and gun-related offenses.  Cerrone Dec., Exh. 1.  In a motion in his criminal case to modify his release conditions, Anthony Gerace stated, through his attorney, on February 12 and March 6, 2020, that

he had become employed full-time as a "restaurant manager" or "kitchen manager" "at the kitchen at Pharoah's Gentlemen's Club."  Cerrone Dec., Exh. 2, ¶ 3; Exh. 3, ¶ 11.

Anthony Gerace, as the "kitchen manager" or "restaurant manager" of Plaintiff's adult entertainment business, is a "key employee" within the meaning of SBA's SOP, i.e.: "an employee who manages daily operations, e.g. overseeing a department or a division, not a clerical staff position."  SBA SOP 50 10 5(K), Subpart A, p. 11, ¶ (b), and p. 42, ¶ 5, Subpart B, p. 140, ¶ 2, Subpart B, p. 222, ¶ e, and Subpart B, p. 322, ¶ 4 (Appendix A).  As a "key employee," Anthony Gerace is an "Associate" of Plaintiff's business.  Since Anthony Gerace is under federal indictment, Plaintiff is ineligible for an SBA-backed loan under 13 C.F.R. § 120.110(n).

## C.     The CARES Act and the PPP Did Not Materially Alter the List of Businesses Ineligible for SBA-Backed Loans

In opposition to the Government's argument that 13 C.F.R. § 120.110(n) makes Plaintiff's business ineligible for a PPP loan, it is anticipated that Plaintiff will argue that the CARES Act precludes application of § 120.110, and the SBA's SOP, because the CARES Act states that PPP loans are available to "any business concern."  Dkt. # 3-6, pp. 4-5 (arguing that the CARES Act precludes application of § 120.110(p)). This argument is meritless.

"We evaluate challenges to an agency's interpretation of a statute that it administers within the two-step *Chevron* deference framework." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 507 (2d Cir. 2017) (*citing Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257, 264 (2d Cir. 2016)); *see Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). At *Chevron* step one, a court asks "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If Congress's directive is unambiguous, then the agency and the courts are bound by that directive. *Id.* at 842-43. If, however, "the statute [is] silent or ambiguous with respect to the specific issue," the analysis moves on to *Chevron* step two.

*Id.* at 843. At step two, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.  "'[I]f the agency interpretation is reasonable, then [the court] must defer to it.'"  *Kar Onn Lee v. Holder*, 701 F.3d 931, 936 (2d Cir. 2012) (*quoting Adams v. Holder*, 692 F.3d 91, 95 (2d Cir.2012)).

Here, Congress explicitly placed the CARES Act and the PPP under the SBA's existing Section 7(a) loan program, and stated that PPP loans are to be provided "under the same terms, conditions, and processes" as other Section 7(a) loans "[e]xcept as otherwise provided" by the terms of the CARES Act itself.  CARES Act, § 1102(a), 134 Stat. at 287 (codified at 15 U.S.C. § 636(a)(36)(B)). Congress in the CARES Act enumerated several restrictions that, although applicable to ordinary Section 7(a) loans, shall not apply to PPP loans. See, e.g., id. § 1102(a), 134 Stat. at 288 (codified at 15 U.S.C. § 636(a)(36)(D)). For example, "non-profits" are excluded from Section 7(a) loans under the same regulation containing the restriction at issue here, see 13 C.F.R. § 120.110(a), but Congress expressly allowed certain non-profits to receive PPP loans, see 15 U.S.C. § 636(a)(36)(D)(i). In addition, the SBA may not offer "financial assistance" under the Section 7(a) program "if the applicant can obtain credit elsewhere," 15 U.S.C. § 636(a)(1)(A)(i), but Congress expressly lifted that restriction for purposes of the PPP, see id. § 636(a)(36)(I). Congress also expressly lifted the application of affiliation rules which ordinarily apply to determine eligibility for Section 7(a) loans, see id. § 636(a)(36)(D)(iv); and the collateral and personal guarantee requirements upon which Section 7(a) loan assistance is typically conditioned, id. § 636(a)(36)(J).  With the specific exception of non-profit businesses, no provision of the CARES Act, however, directs the SBA, when administering the PPP, to waive its longstanding rule, 13 C.F.R. § 120.110, prohibiting SBA loans to 18 types of businesses, including those who employ an associate with a felony indictment and those engaged in the adult entertainment

12

business.  The SBA has accordingly continued to apply those restrictions to the PPP consistent with the CARES Act's plain text.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation marks omitted) ("[I]t is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion" of statutory provisions, particularly in the same Act).

It is anticipated that Plaintiff, arguing to the contrary, will rely upon 15 U.S.C. § 636(a)(36)(D)(i) which provides that "[d]uring the covered period, in addition to small business concerns, ***any business concern***, nonprofit organization, veterans organization, or Tribal business concern described in [15 U.S.C. § 657a(b)(2)(C)] shall be eligible to receive a [PPP] loan" if it meets the relaxed applicant size limitations for PPP loans, *id.* § 636(a)(36)(D)(i)(I), (II) (emphasis added).  Dkt. # 3-6, pp. 2, 5 (*citing DV Diamond Club of Flint, LLC v. United States Small Bus. Admin.*, No. 20-CV-10899, 2020 WL 2315880 (E.D. Mich. May 11, 2020)).  *DV Diamond Club*, upon which Plaintiff principally relies, held that, because Congress stated that "in addition to small business concerns, *any* business concern . . . shall be eligible to receive a covered loan" if they meet the size standards specified in that provision, id. (emphasis added), "Congress did not intend there to be any other criteria for loan guarantee eligibility" under the CARES Act.  *DV Diamond Club*, 2020 WL 2315880 at * 10.  Thus, the *DV Diamond Club* court concluded that § 120.110(p) was not operative for purposes of PPP loans under the CARES Act.  *Id.*

Although the reasoning in *DV Diamond Club* may not be "unpersuasive on its face," *The Diocese of Rochester*, 2020 WL 3071603 at * 6, that interpretation is untenable, and places far more weight on § 636(a)(36)(D)(i) than that provision can bear.  "In making the threshold determination under *Chevron*, a reviewing court should not confine itself to examining a particular statutory provision in isolation."  *The Diocese of Rochester*, 2020 WL 3071603 at * 6 (*quoting Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (citations and internal

quotation marks omitted). "To the contrary, '[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *The Diocese of Rochester*, 2020 WL 3071603 at * 6 (*quoting Nat'l Ass'n of Home Builders*, 551 U.S. at 666 (citations and internal quotation marks omitted).

As held by Judge Wolford, just a few days ago, in *The Diocese of Rochester*, "when examined in the context of the statutory scheme as a whole, it becomes clear that 15 U.S.C. § 636(a)(36)(D)(i) is properly understood not as setting forth the exclusive criteria for participation in the PPP, but merely as expanding the size limitations that would otherwise have been in place." *The Diocese of Rochester*, 2020 WL 3071603 at * 6.   In rejecting *DV Diamond Club*, Judge Wolford properly reasoned that:

> Under normal circumstances, loans under Section 7(a) are available only to "small business concerns," as defined in applicable SBA regulations. See 15 U.S.C. § 632(a)(1); id. § 636(a); see, e.g., How Does SBA Define "Business Concern or Concern"?, 13 C.F.R. § 121.105 (2005). In establishing the PPP, Congress expanded the size restrictions found in those regulations to allow larger businesses to qualify for participation. See 15 U.S.C. § 636(a)(36)(D)(i) (providing that larger businesses are eligible for PPP participation "in addition to small business concerns"). However, the Court disagrees with Plaintiffs that in expanding the size restrictions, Congress unambiguously provided that there could be no other eligibility criteria …

> Other provisions of the CARES Act clearly anticipate the existence of additional eligibility criteria. For example, § 1102(a)(36)(D)(ii)(I) of the CARES Act provides that "[d]uring the covered period, individuals who operate under a sole proprietorship or as an independent contractor and eligible self-employed individuals shall be eligible to receive a covered loan." 15 U.S.C. § 636(a)(36)(D)(ii)(I). Further, § 1102(a)(36)(I) of the CARES Act waives the requirement that a small business concern be unable to obtain credit elsewhere in order to be eligible for a covered loan. 15 U.S.C. § 636(a)(36)(I). These waivers of otherwise applicable eligibility requirements would be superfluous if, in fact, § 1102(a)(36)(D)(i) unambiguously eliminated any requirement beyond size. It is "one of the most basic interpretive canons . . . that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation and original alterations omitted).

14

*The Diocese of Rochester*, 2020 WL 3071603 at * 6-7.

Also, in placing so much weight on the phrase "any business concern," Plaintiff overlooks the canon of statutory construction providing that the meaning of the word "any" can differ if "strange and indeterminate results" would emerge from adopting the usual meaning of "any" in a statute. *Nixon v. Mo. Mun. League,* 541 U.S. 124, 132-33 (2004); *see also Small v. United States*, 544 U.S. 385, 388-94 (2005) (holding that the term "any court," as used in 18 U.S.C. § 922(g)(1), was limited to domestic courts because, *inter alia*, including foreign courts would create anomalies that Congress could not have intended).  If adopted, Plaintiff's reading of the CARES Act would lead to just such strange and anomalous results.  As Plaintiff must acknowledge, under its interpretation of the CARES Act, Congress in one fell swoop purportedly compelled the SBA to make loans available to: (i) businesses located in foreign countries; (ii) pyramid sale distribution plans; (ii) businesses engaged in illegal activities; (iv) private clubs and businesses which limit the number of memberships for reasons other than capacity; (v) businesses with an associate who is incarcerated, on probation, on parole, or who has been indicted for a felony or a crime of moral turpitude; (vi) adult entertainment businesses; (vii) businesses that have previously defaulted on federal loans resulting in a loss to the Federal Government; and (viii) speculative businesses (such as oil wildcatting). *See* 13 C.F.R. § 120.110(e), (f), (h), (i), (n), (p) (q), (s).

Moreover, Plaintiff's interpretation of the CARES Act also fails to account for the fact that the categories of businesses listed in section 120.110 include "[n]on-profit businesses."  13 C.F.R. §120.110(a).  If Congress meant the phrase "any business concern" in subparagraph 636(a)(36)(D)(i) to extend PPP eligibility to all categories of businesses identified in 13 C.F.R. § 120.110, then it would not have been necessary to separately specify in that same provision of the Act that "nonprofit organizations" may also apply for PPP loans.  This suggests that Congress was

aware of the restrictions contained in § 120.110 but only expressly allowed PPP loans to be made to one of those forbidden categories: non-profit businesses.  Compare 13 C.F.R. § 120.110(a) (excluding non-profits from SBA loans), with 15 U.S.C. § 636(a)(36)(D)(i) (allowing Paycheck Protection loans to various non-profits).

Plaintiff offers not a word in its brief to explain why Congress would find it necessary or appropriate in the public interest to compel the SBA, on a wholesale basis, to make PPP loans available to businesses falling into these categories.  Nor does it justify its conclusion that Congress ordained such far-reaching and profound changes in longtime SBA loan policy in such inconspicuous fashion.  *See Jones v. United States*, 526 U.S. 227, 234 (1999) ("Congress is unlikely to intend radical departures from past practice without making a point of saying so."); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouse holes.").  Consistent with this analysis, Judge Wolford held in *The Diocese of Rochester* that "[t]he Court will not presume that simply by using the phrase 'any business' concern in one part of the CARES Act, Congress meant to implicitly eliminate the long-standing statutory requirements for Section 7(a) loans" concerning creditworthiness.  *The Diocese of Rochester*, 2020 WL 3071603 at * 7.[5] Judge Wolford thus concluded, at step one of the *Chevron* analysis, that "[p]ut differently, nothing in the CARES Act requires that a bankrupt debtor be eligible for participation in the PPP—this detail was left by Congress for determination by the SBA."  2020 WL 3071603 at * 7.[6]

---

[5] *See also Henry Anesthesia Assocs. LLC v. Carranza*, No. 19-64159-LRC, 2020 WL 3002124, at *9 (Bankr. N.D. Ga. June 4, 2020) (quotations and original alteration omitted)  ("[N]either the CARES Act nor the PPP expressly state that the SBA cannot consider creditworthiness of potential PPP borrowers or that it is relieved from its obligation to assure that all loans made under § 636(a) be of sound value to assure repayment.").

[6] *See also Penobscot Valley Hosp. v. Carranza*, No. 19-10034, 2020 WL 3032939, at *8 (Bankr. D. Me. June 3, 2020) ("Congress did not explicitly say whether debtors in bankruptcy are categorically excluded from the PPP. . . .

The district court in *DV Diamond Club* acknowledged that "it would ordinarily be absurd to conclude that Congress meant to provide financial assistance to, among others, certain sexually oriented businesses and private clubs that discriminate" in accepting members. *DV Diamond Club*, 2020 WL 2315880 at * 14.  The district court reasoned, however, that the purpose of the PPP is "to protect American workers" during the COVID-19 pandemic, and thus this "absurd[ity]" did not have weight in this circumstance. *DV Diamond Club*, 2020 WL 2315880 at * 14.  This reasoning is not persuasive. The SBA's restrictions on certain categories of businesses receiving SBA funds reflect longstanding policies about the best uses of limited agency resources and taxpayer dollars. *See* 60 Fed. Reg. at 64,360; *see also, e.g.*, 51 Fed. Reg. at 37,589. In establishing the PPP, and making a substantial, but nonetheless limited amount of taxpayer dollars available to subsidize small businesses during the COVID- 19 pandemic, it is reasonable that Congress would choose to leave many of the SBA's restrictions on ineligible businesses intact, in order to prioritize the best use of taxpayer funds in light of preexisting government policies and the public interest. *See The Diocese of Rochester*, 2020 WL 3071603 at * 8.[7] And, as discussed, the statutory text directly supports that interpretation. Congress has also revisited the PPP in subsequent legislation, see Paycheck Protection Program and Health Care Enhancement Act, 134 Stat. at 620 and the Paycheck Protection Program Flexibility Act of 2020, H.R. 7010, 116th Congress, but has not made any changes to PPP eligibility requirements, despite undoubtedly being aware of SBA's interpretation given the intense scrutiny that PPP has received.

---

Congress intended the SBA to fill a statutory gap and determine whether debtors in bankruptcy would be eligible for the PPP. As a result, in evaluating the APA claim, the Court proceeds to the second step of the *Chevron* framework.").

[7] *See Schuessler v. U.S. Small Bus. Admin.*, No. AP 20-02065-BHL, 2020 WL 2621186, at *2 (Bankr. E.D. Wis. May 22, 2020) ("Given . . . the speed with which Congress adopted the CARES Act and wanted funds to be disbursed in the light of the pandemic, it is understandable that Congress did not spell out in the statute all requirements for PPP participation. Instead, Congress entrusted the details to the SBA, engrafting the PPP on to the SBA's existing section 7(a) lending program, and giving the SBA emergency rulemaking authority.").

The SBA's interpretation of subparagraph 636(a)(36)(B) as preserving its authority under section 120.110 is embodied in a regulation issued by the SBA in exercise of emergency rulemaking authority conferred by Congress under the CARES Act.  *See* CARES Act. § 1114 (directing SBA within 15 days to "issue regulations to carry out [the PPP] and the amendments made by [the PPP] without regard to the notice requirements under section 553(b) of title 5, United States Code"); SBA, *Business Loan Program Temporary Changes; Paycheck Protection Program*, Interim Final Rule, 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020) (providing that businesses "identified in 13 CFR 120.110," with the exception of nonprofit organizations, are ineligible for PPP loans); *id.* at 20817 (citing authority under CARES Act § 1114).  The rule's interpretation of the CARES Act is clearly correct, and entitled to deference.  *The Diocese of Rochester*, 2020 WL 3071603 at * 8-9 (holding that the SBA's regulatory determination that debtors in bankruptcy are ineligible for PPP loans was entitled to deference because barring debtors in bankruptcy from PPP loan eligibility was consistent with the SBA's duty to ensure loan creditworthiness).

Thus, (i) the CARES Act and the PPP did not expressly or impliedly alter the SBA's long-standing regulation at 13 C.F.R. § 120.110(n) making businesses associated with an indicted felon ineligible for an SBA-backed loan; and (ii) the SBA's regulatory determination that its ineligibility rule found at § 120.110 applies to PPP loans is entitled to deference.  Accordingly, plaintiff is not likely to succeed on the merits of its claims because it is ineligible for a PPP loan under 13 C.F.R. § 120.110(n).

18

# POINT II

## PLAINTIFF LACKS STANDING TO RAISE CONSTITUTIONAL CHALLENGES TO 13 C.F.R. § 120.110(p)

### A.      Standard of Review on a Rule 12(b)(1) Motion

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Luckett v. Bure,* 290 F.3d 493, 496 (2d Cir. 2002) (quotation omitted).  Plaintiff bears the burden of establishing this Court's subject matter jurisdiction.  *Luckett*, 290 F.3d at 496- 497.  While "a motion to dismiss for want of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) is reviewed under the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)," [*Pennacchio ex rel. Old World Brewing Company, Inc. v. Powers,* No. 05- CV-0985, 2007 WL 446355 (E.D.N.Y. Feb. 5, 2007)], "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Shipping Financial Services Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).

A court may consider evidence on a 12(b)(1) motion without converting such motion to one under Rule 56.  *See e.g., Ray Legal Consulting Grp. v. Gray*, 37 F.Supp.3d 689, 696 (S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

### B.      Governing Law on Standing

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "[N]o principle is more fundamental to the judiciary's proper role" under the Constitution's separation of powers. *Id.*; *see also Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016). "[A]n essential and unchanging part of the case-or-controversy requirement" is that litigants must have "standing to invoke the authority

19

of a federal court," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006), assuring they have

a sufficient "personal stake in the outcome of [a] controversy as to . . . justify [the] exercise of the

court's remedial powers on [their] behalf." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645,

1650 (2017). Standing is, therefore, a "threshold jurisdictional question," *Steel Co. v. Citizens for

a Better Env't*, 523 U.S. 83, 102 (1998), involving "the power of the court to entertain the suit,"

*Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To establish Article III standing, a plaintiff must seek relief from an injury that is "[i]

concrete, particularized, and actual or imminent; [ii] fairly traceable to the challenged action; and

[iii] redressable by a favorable ruling." *Amnesty Int'l USA*, 568 U.S. at 409. As the party invoking

federal court jurisdiction, a plaintiff must establish each of these elements "in the same way as any

other matter on which the plaintiff bears the burden of proof, *i.e.*, with the same manner and degree

of evidence required at the successive stages of litigation." *Bennett v. Spear*, 520 U.S. 154, 167-

68 (1997) (citations omitted).

## C.     Discussion

As shown in Point I(A) above, Plaintiff is ineligible for an SBA-backed PPP loan under 13

C.F.R. § 120.110(n) because a key member of its managerial staff is under federal indictment.

Because Plaintiff is ineligible for a loan under § 120.110(n), Plaintiff's alleged injury – its inability

to get an SBA-backed loan under the PPP – will not be redressed even if it prevails in its

constitutional challenge to 13 C.F.R. § 120.110(p).  For this reason, the Government is entitled to

judgment dismissing Plaintiff's constitutional claims due to Plaintiff's lack of standing.

## POINT III

## PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CONSTITUTIONAL CLAIMS[8]

### A.     The Government is Not Required to Subsidize Plaintiff's Speech

It is fundamental to constitutional jurisprudence that "although government may not place obstacles in the path of a person's exercise" of constitutional freedoms, including "freedom of speech, it need not remove those not of its own creation." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549-50 (1983) (citations and internal quotation marks omitted).  The Government, therefore, "is not required by the First Amendment to subsidize lobbying" (as held in *Regan*) or any other form of speech, and does not restrict or penalize speech simply because it has "chosen not to pay for [it]."  *Id.* at 546 (citing *Cammarano v. United States*, 358 U.S. 498, 513 (1959)).  *See also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that the government "is not required to assist others in funding the expression of particular ideas."); *United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality) (a "decision not to subsidize the exercise of a fundamental right does not infringe the right.") (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991)); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (the government "is not required to subsidize First Amendment rights[.]").

This bedrock principle is dispositive of Plaintiff's claims.  As Plaintiff acknowledges, the economic obstacles to the exercise of their First Amendment freedoms were placed in their path by the COVID-19 pandemic and New York State's efforts to contain it.  Dkt. # 3-6, p. 2 ("As a small business struggling financially due to the COVID-I9 pandemic …..").  Those obstacles are not of the Federal Government's creation.  *See Am. Ass'n of Political Consultants v. United States*

---

[8] *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

*Small Bus. Admin. ("AAPC")*, No. CV 20-970, 2020 WL 1935525, at *3 (D.D.C. Apr. 21, 2020) (in case challenging 13 C.F.R. § 120.110(r) – which makes lobbying firms ineligible for SBA-backed loans – district court held that "the COVID-19 crisis—and not the federal government—directly or indirectly created the financial obstacles which may threaten plaintiffs' ability to engage in future political speech."), *aff'd*, *Am. Ass'n of Political Consultants v. United States Small Bus. Admin.*, Case #20-5101 Document #1844213 (D.C. Cir. May 26, 2020).  Thus, the Government has no constitutional obligation to remove them.  *Regan*, 461 U.S. at 549-50.

For its part, Plaintiff fails to cite a single precedent holding that the Government must fund or subsidize speech on particular topics, or of particular genres, that it does not wish to promote. Indeed, Plaintiff's entire claim is based on the mistaken premise that the Government must subsidize its speech.  Dkt. # 3-6, p. 6 (claiming that the Government has caused harm "[b]y placing the obstacle of a funding limitation in the path of Pharaohs").  Plaintiff is asking the Court to conclude here that the SBA is constitutionally obligated to guarantee heavily subsidized PPP loans for a business that will spend the proceeds on products, services, performances, and displays of a prurient sexual nature that the Government has refused to subsidize for at least a quarter century. However, the Government has not restricted or regulated Plaintiff's First Amendment activities, and Plaintiff is "free to engage in such speech as [it] see[s] fit." *Ysursa*, 555 U.S. at 359. Congress and the SBA have "merely refused to pay for" Plaintiff's activities "out of public monies." *Regan*, 461 U.S. at 549-50 (*quoting Harris v. McRae*, 448 U.S. 297, 318 (1980)) ("Although [the plaintiff] [did] not have as much money as it want[ed], and therefore [could not] exercise its freedom of speech as much as it would like, the Constitution 'does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom.'").

**B.   Section 120.110(p) Is Not a Content-Based Restriction on Speech.**

Plaintiff contends that section 120.110(p) must be invalidated as a content-based restriction on speech.  Dkt. # 1, ¶ 55.  This claim suffers from numerous fatal defects and has no likelihood of success.

In the first place, section 120.110(p) is not a prohibition or restriction on speech.  It simply embodies the SBA's policy that the agency will not use federal funds to subsidize businesses of a prurient sexual nature.  *See AAPC*, 2020 WL 1935525 at *5 (holding that an analogous rule prohibiting SBA financing for businesses engaged in political activities or lobbying "is not a prohibition or restriction on speech").  As explained above, the Supreme Court has held time and again that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it.  *Regan*, 461 U.S. at 546; *Am. Library Ass'n*, 539 U.S. at 212; *Rust*, 500 U.S. at 193.

The controlling principle here, articulated many times by the Supreme Court, is that the "government can make content-based distinctions when it subsidizes speech" as opposed to regulating speech.  *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188-89 (2007).  It has "broad discretion," in fact, "to make content-based judgments in deciding what private speech to make available to the public."  *Am. Library Ass'n*, 539 U.S. at 204-05.  *See also Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998) ("[I]n the subsidy context," the Government may allocate funding "according to criteria that would be impermissible were direct regulation of speech . . . at stake[.]").  Even though content-based, the Government's funding choices will be upheld unless they are shown to be "the product of invidious viewpoint discrimination," or "aim[ed] at the suppression of dangerous ideas."  *Id.* at 586-87; *Regan*, 461 U.S. at 543-49 ("The case would be different if Congress were to discriminate invidiously in its subsidies" with an

23

"inten[t] to suppress any ideas."). *See also Leathers*, 499 U.S. at 447, 450-51 (1991) (explaining that "differential taxation of First Amendment speakers is constitutionally suspect [only] when it threatens to suppress the expression of particular ideas or viewpoints").

Section 120.110(p) is not subject to invalidation under these standards. The SBA's policy against subsidizing loans to businesses of a prurient sexual nature is entirely viewpoint-neutral, and singles out no particular ideas for disfavorable treatment. *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273 (2d Cir. 1997) (holding that a statute prohibiting sales on military bases of material that depicts or describes nudity or sexual activity "in a lascivious way" was neither impermissibly viewpoint-based, nor unconstitutionally vague). The rule prohibits federally subsidized loans to these businesses without regard to any ideas they wish to convey, promote, or oppose through the displays, depictions, or performances they present, or the products or services they sell. *See AAPC*, 2020 WL 1935525 at *5 (SBA policy against loans to political consultants and lobbyists is viewpoint-neutral and does not suppress certain ideas or beliefs).

In Plaintiff's view, the SBA's policy regarding businesses of a prurient sexual nature exhibits disagreement with Plaintiff's message, but they are mistaken. Numerous messages and ideas can be conveyed through any given medium of expression, including depictions, displays and performances of a prurient sexual nature. Regardless of the message conveyed, be it Plaintiff's message (whatever that may be) or another, section 120.110(p) even-handedly provides that the SBA will not fund it.

It would not matter to the analysis, however, even if section 120.110(p) were taken as an expression of disagreement with Plaintiff's unstated message. In *Rust*, private clinics that received federal funding to provide family-planning services objected to Government regulations that prohibited the use of those federal funds to counsel patients about abortion as a family-planning

method.  500 U.S. at 179-80.  The grantees contended that the rules impermissibly discriminated

on the basis of viewpoint, because they prohibited all discussion about abortion as a lawful family-

planning option.  *Id.* at 192.  The Supreme Court disagreed, finding "no question but that the …

prohibition … [was] constitutional."  *Id.*  The Court explained that even where protected activity

is implicated, the Government, when exercising its authority to subsidize certain activities but not

others, may make "value judgment[s]" and "implement [those] judgment[s] by the allocation of

public funds."  *Id.* at 192-93.  "In so doing the Government [does] not discriminate[ ] on the basis

of viewpoint; it … merely [chooses] to fund one activity to the exclusion of another."  *Id.* at 193.

That decision, "without more, cannot be equated with the imposition of a 'penalty'" or the

"suppress[ion] [of] a dangerous idea."  *Id.* at 193-94.

So too here.  Even assuming, as Plaintiff does, that section 120.110(p) embodies a value

judgment about its message, the mere decision that the SBA will not subsidize the expression of

that message is neither viewpoint discriminatory nor offensive to the First Amendment.  *See*

*AAPC*, 2020 WL 1935525 at *5.  The rule must therefore be upheld.

## C.  Section 120.110(p) Need Not Conform to Constitutional Standards Governing Prohibitions of Obscenity.

Plaintiff appears to argue that section 120.110(p) violates the First Amendment because

the standard by which it identifies the type of performances, products, services, and presentations

that the SBA will not finance—that is, material of a "prurient sexual nature"—does not satisfy the

three-prong test for obscenity articulated in *Miller v. California,* 413 U.S. 15, 24 (1973).  Dkt. #

1, ¶ 77 (b).  This argument is baseless.

As held in *Miller*, government has a "legitimate interest in prohibiting the dissemination

or exhibition of obscene material," 413 U.S. at 18, and the *Miller* test sets "the standards which

must be used to identify obscene material that [government] may regulate without infringing on

the First Amendment," *id.* at 20.   As explained *supra*, at 13, section 120.110(p) does not

"prohibit[ ]" or even "regulate" speech in any fashion.   It simply embodies a determination by the

SBA that it will not offer federal financial support for certain "sexually oriented" products,

services, and activities, *see* 60 Fed. Reg. at 64360, a decision that does not "infring[e] on the First

Amendment," *Miller*, 413 U.S. at 20.  *See Am. Library Ass'n*, 539 U.S. at 212; *Rust*, 500 U.S. at

193.  Accordingly, the Constitution did not require the SBA to adopt the *Miller* test when deciding,

and describing, which products, services, and activities it will not finance.   It was free for that

purpose to rely instead on the standard it chose, material of a "prurient sexual nature."

## D.   Section 120.110(p) Does Not Violate the Doctrine of Unconstitutional Conditions.

Plaintiff argues in passing that section 120.110(p) forces them to abandon their chosen

form of expression or forgo a government benefit, in violation of the doctrine of unconstitutional

conditions.  Dkt. # 1, ¶ 77(c).  This argument, too, is meritless.

SBA loan programs generally, and the PPP in particular, represent the exercise of

Congress's power under the Spending Clause, U.S. Const. Art. I, § 8, cl. 1.   These programs, and

the considerable sums of taxpayer money that Congress appropriates to fund them, are a form of

government subsidy that encourage third-party lenders to make funds available to small-business

concerns that otherwise could not find credit on reasonable terms.[9]   The Spending Clause gives

---

[9] The PPP is undeniably a subsidy. The PPP makes $659 billion available to small businesses nationwide to which they would not otherwise have ready access, if at all.  The SBA's guarantee provides a powerful financial incentive to lenders to make these loans, loans they would not otherwise be willing to underwrite.  In addition, although in theory the loans must be repaid, under the CARES Act and the SBA's interim rules, the interest rate on PPP loans is capped at one percent, collateral is not required, guarantee fees are waived, and perhaps most critically, up to the full principal amount of a loan may qualify for forgiveness.  Thus the Act makes these loans far less expensive to small-business borrowers than market-rate loans would be.  Moreover, these savings for borrowers come at significant, and potentially enormous cost to taxpayers.  The SBA subsidizes every PPP loan by paying an origination fee to the lender and may have to pay billions of additional dollars to lenders to reimburse them for forgiven loans, and make good on SBA's guarantees in the event of borrower defaults.  *See AAPC*, 2020 WL 1935525 at *3-4 (concluding that PPP loans are the legal and practical equivalent of subsidies).

Congress "broad discretion to tax and spend for the 'general Welfare,'" including the authority "to impose limits on the use of [the] funds" it appropriates for particular programs or activities, "to ensure they are used in the manner Congress intends." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds," even where the condition "may affect the recipient's exercise of its First Amendment rights." *Id.* at 214 (citing *Am. Library Ass'n*, 539 U.S. at 212). "At the same time, however, … the Government may not deny a benefit to a [party] on a basis that infringes [its] constitutionally protected freedom of speech[.]" *Id.*

The relevant distinction, the Court explained, is between conditions that merely "define the limits of [a] Government spending program" by "specify[ing] the activities the [Government] wants [or does not want] to subsidize"—which are permissible—and conditions that "leverage[ ] federal funding to regulate [recipients'] speech outside the scope of the program"—which are not. *All. for Open Soc'y*, 570 U.S. at 214-17. *See also Rust*, 500 U.S. at 194, 197.

To illustrate the difference, both *Alliance for Open Society*, 570 U.S. at 215, and *Rust*, 500 U.S. at 197-98, pointed to *Regan*. There the IRS had denied tax-exempt status to the plaintiff, a non-profit organization, because its intended use of tax-deductible contributions to support its lobbying activities was prohibited by section 501(c)(3) of the Internal Revenue Code. *Regan*, 461 U.S. at 542. The plaintiff challenged this prohibition as an unconstitutional condition imposed on its receipt of tax-deductible contributions from donors. *Id.* at 545. The Court had no difficulty rejecting this claim. *See id.* at 545-46. Treating the tax-deductibility of contributions as "similar to cash grants" to the organization, the Court concluded that the plaintiff could continue to receive tax-deductible contributions for its non-lobbying activities by forming an affiliated tax-exempt entity, under section 501(c)(4) of the Code, that would be permitted to conduct lobbying activities

using sources of funds other than tax-deductible (that is, federally subsidized) contributions. *Id.* at 544-46. Thus, the plaintiff was not prohibited from using non-subsidized contributions to engage in lobbying, nor denied other government benefits because of its intent to lobby; "Congress ha[d] merely refused to pay for the lobbying out of public monies." *Id.* at 545.

In reaching this conclusion, *Regan* distinguished *Perry v. Sinderman*, 408 U.S. 593 (1972). In *Perry*, the Court concluded that an untenured professor at a state college could not be terminated based on his constitutionally protected expression, holding that government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests[.]" 408 U.S. at 597-98. *Regan* explained, however, that a "mere[ ] refus[al]" to pay for the expression of a private party "out of public monies" does not "fit[ ] the [*Perry*] model." 461 U.S. at 545. Government does "not infringe[ ] any First Amendment rights" within the meaning of *Perry* when it "simply [chooses] not to pay for" a private party's speech. *Id.* at 546.

That is the situation here. Section 120.110(p) does not prohibit businesses of a prurient sexual nature from expressing themselves using their own funds, or deny them benefits "independent of [SBA loans] "on account of [their] intention" to engage in expressive activities. SBA "merely refuse[s] to pay for [these activities] out of [SBA] monies." *Regan*, 461 U.S. at 545. That decision is perfectly constitutional.

That conclusion is reinforced by *American Library Association*, *supra.* The plaintiffs there challenged a federal law that required public libraries receiving federal financial assistance for the purpose of providing Internet access to install filtering software designed to block access to online pornography. *See* 539 U.S. at 198-99. The plurality rejected the contention that Congress had imposed an unconstitutional condition on the libraries' receipt of this federal assistance. *Id.* at 210-12. Congress had not "penalize[d]" libraries that chose not to install filters by denying them

28

other, unrelated federal benefits, and the libraries remained free to offer unfiltered Internet access to their patrons using their own funds, without the benefit of federal aid.  *Id.* at 212.  Congress had simply decided not to subsidize unfiltered Internet access.

Likewise, under section 120.110(p), no small business is denied benefits outside the parameters of SBA lending simply because it engages in prurient sexual activities.  Businesses that wish to conduct these activities are free to do so using their own funds rather than Government-subsidized loans.  What they cannot do is have it both ways, as Plaintiff insists.  Plaintiff is not entitled to federal subsidies *and* to use those subsidies to finance activities, even expressive activities, that the Government does not wish to fund, any more than public libraries were entitled both to receive federal subsidies *and* to use those subsidies for unfiltered Internet access that the Government did not wish to pay for.

## E.      Section 120.110(p) Is Not Impermissibly Vague.

Plaintiff contends that section 120.110(p) is impermissibly vague.  Dkt. # 1, ¶ 77(d).  This argument, too, is unavailing.

The void-for-vagueness doctrine, as Plaintiff observes, is a due-process doctrine requiring that a law "give the person of ordinary intelligence a reasonable opportunity to know what is *prohibited*, so that he may act accordingly."  *Id.* at 23 (emphasis added) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  "A statute which either *forbids or requires* the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."  *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007) (emphasis added) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)).  The doctrine requires greater "precision

of *regulation*" in areas touching on First Amendment rights.  *Keyishian v. Bd. of Regents Univ.*, 385 U.S. 603-04 (1967) (emphasis added).

However, Section 120.110(p) is not a prohibition or regulation of speech that forbids or requires Plaintiff to do anything.  Rather, it merely sets terms on which the Government will exercise its broad discretion to subsidize speech, or not.  *All. for Open Soc'y*, 570 U.S. at 215; *Rust*, 500 U.S. at 192-94.  Accordingly, the controlling precedent is *National Endowment for the Arts v. Finley, supra.*  In *Finley,* four performance artists and an artists' association brought suit contesting the validity of a federal law that required the NEA to "tak[e] into consideration general standards of decency and respect for the diverse beliefs and values of the American public" when making grant determinations.  524 U.S. at 572, 576-78.  Congress enacted this "decency and respect" provision following the public controversy that erupted after an NEA grant was used to fund an exhibition of homoerotic photographs by Robert Mapplethorpe, and another was awarded to photographer Andres Serrano, whose work, entitled "Piss Christ," depicted a crucifix immersed in urine.  *Id.* at 574-76.  The district court agreed with the plaintiffs' contention that the "decency and respect" criteria were unconstitutionally vague, stating that they "fail[ed] adequately to notify applicants of what is required of them or to circumscribe NEA discretion."  *Id.* at 578.  The court of appeals agreed with the district court, "[c]oncluding that the decency and respect criteria [were] not susceptible to objective definition."  *Id.* at 579.  The Supreme Court reversed.

The Court acknowledged that "[u]nder the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory enforcement of vague standards," and that the terms of the "decency and respect" provision were "undeniably opaque."  *Id.* at 588.  "[I]f they appeared in a criminal statute or regulatory scheme," the Court allowed, "they could raise substantial vagueness concerns."  *Id.*  Nevertheless, the Court sustained the validity of the "decency and

respect" provision because, in the context of a grant program, "[i]t [was] unlikely … that speakers [would] be compelled to steer too far clear of any 'forbidden area.'" *Id.* (distinguishing, *inter alia*, *Grayned v. City of Rockford*).   And even if some artists "conform[ed] their speech to what they believe[d] to be the decisionmaking criteria in order to acquire funding," "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."  *Id.*  *Finley* thus establishes that "the standard set in evaluating statutes related to subsidies for speech is less demanding than the standard for statutes that impose penalties for speech."  *Ostrom v. O'Hare*, 160 F. Supp. 2d 486, 496 (E.D.N.Y. 2001); *see also Gen. Media Commc'ns, Inc.*, 131 F.3d 273 (holding that a statute prohibiting sales on military bases of material that depicts or describes nudity or sexual activity "in a lascivious way" was neither impermissibly viewpoint-based, nor unconstitutionally vague); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 94 (1st Cir. 2004); *United States v. Nat'l Training & Info. Ctr., Inc.*, 532 F. Supp. 2d 946, 953-54 (N.D. Ill. 2007) ("[B]ecause there is no right to government subsidization of free speech, regulations relating to entitlement programs are entitled to greater leniency in their construction.").

Under *Finley's* far less demanding standard, section 120.110(p) is plainly constitutional. Plaintiff condemns the rule's prurience standard as failing to supply intelligible guidelines for businesses or the objective guidance needed to avoid arbitrary application.  But for all intents and purposes here the PPP is a grant program, and as a standard by which the Government makes grant determinations, "prurient sexual nature" is no more opaque, indeed it is far less so, than the criteria "general standards of decency," and "respect for the diverse beliefs and values of the American public," that the Court readily upheld in *Finley*.  And although section 120.110(p) has governed SBA lending decisions under the section 7(a) program for nearly a quarter-century, Plaintiff does not even allege, much less offer proof, that they or other speakers like them have steered clear of

"forbidden area[s]," or "conform[ed] their speech to what they believe to be the decisionmaking criteria" in order to obtain SBA business loans.  *See Finley*, 524 U.S. at 588-89.   Section 120.110(p) is not impermissibly vague.

**F.      Section 120.110(p) Easily Meets Fifth Amendment Requirements.**

Plaintiff maintains that section 120.110(p) violates Fifth Amendment guarantees of Equal Protection and "occupational liberty."  Dkt. # 1, ¶¶ 65-79; ¶ 78(c).  Neither contention has merit.

Plaintiff's Equal Protection argument is foreclosed by *Regan*, and *Ysursa*.  In *Regan* the plaintiff, in addition to raising a First Amendment challenge, also "contend[ed] that the equal protection component of the Fifth Amendment render[ed] the [section 501(c)(3)] prohibition against substantial lobbying invalid."  461 U.S. at 546.  The Supreme Court disagreed.  *Id.* at 547-51.  First, because prohibiting the use of federally subsidized contributions for lobbying purposes did not violate the First Amendment rights of non-profit organizations, and because the law was not evidently aimed at suppressing particular ideas, the Court concluded that it was subject only to rational-basis review, not strict scrutiny, under the Fifth Amendment.  *Id.* at 548-49.  The lobbying restriction easily withstood review under this standard, for it was "not irrational" of Congress to decide that the public interest in promoting additional lobbying by charities would not be worth the taxpayer expense.  *Id.* at 550; *see also Ysursa*, 555 U.S. at 359-60 ("Given that the State has not infringed the unions' First Amendment rights" by refusing to make public employee payroll deductions for union political activities, "the State need only demonstrate a rational basis to justify [its decision]."). Rational-basis review "is a paradigm of judicial restraint." *FCC v. Beach Communc'ns, Inc.*, 508 U.S. 307, 314 (1993). "[E]qual [P]rotection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices" in areas of social and economic policy. *Id.* at 313. Under the rational-basis test, a court is "required to uphold the classification 'if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification.'" *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (quoting *Heller*, 509 U.S. at 319).  "'[I]t is entirely irrelevant for constitutional purposes,'" moreover, "whether the conceived reason for the challenged distinction actually motivated" the adoption of the rule. *Sensational Smiles*, 793 F.3d at 286 (quoting *Beach Communc'ns*, 508 U.S. at 315).

Section 120.110(p) satisfies these standards. The adverse "secondary effects" associated with sexually oriented adult entertainment establishments such as Plaintiff's are well known. They include "[a] negative impact . . . on economic development and revitalization; [a] tendency to decrease property value[s] . . .; impediment[s] . . . to economic activity; [and a] tendency to encourage criminal activity[.]" *Buzzetti v. City of New York*, 140 F.3d 134, 136 (2d Cir. 1998) (citing studies and reports); *see also Hickerson v. City of New York*, 146 F.3d 99, 105 (2d Cir. 1998) (discussing studies conducted throughout the country showing "a correlation between adult establishments and negative secondary effects such as increased crime, depressed real estate markets, and an overall decline in the quality and character of surrounding neighborhoods"). Given the SBA's statutory charter to "aid, counsel, assist, and protect . . . the interests of small-business concerns" in order to "strengthen the overall economy of the Nation," 15 U.S.C. § 631(a), it would "not [be] irrational," *Regan*, 461 U.S. at 550, for the agency to decide that its limited financial resources should not be devoted to subsidizing businesses associated with such adverse impacts on the Nation's economic health.[10] Certainly, if it was "not irrational" of the Government in *Regan* to decide it would not be worth the expense to taxpayers of subsidizing lobbying,

---

[10] Of course, when a state or local government seeks to *regulate* the operation of adult- or sexually oriented establishments, intermediate "time, place, and manner" scrutiny applies and the government bears the burden of providing evidence that supports a link between the regulated businesses and harmful secondary effects. *See, e.g., City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 433-37 (2002). As explained above, however, in a case involving only a viewpoint-neutral funding restriction such as section 120.110(p), rational-basis scrutiny applies. *Regan*, 461 U.S. at 550. Under that standard of review, the government "has no obligation to produce evidence to sustain the rationality of a [regulatory] classification," *Heller*, 509 U.S. at 320, and a regulatory choice "may be based on rational speculation unsupported by evidence or empirical data." *Progressive Credit Union*, 889 F.3d at 49 (internal quotation marks omitted).

speech that lies at "the core of the protection afforded by the First Amendment," *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995), then it was permissible for the SBA to decide that it would not be a worthwhile commitment of its finite resources to promote additional speech of a prurient sexual nature, which lies at "the outer ambit of the First Amendment's protection," *Pap's A.M.*, 529 U.S. at 289.[11]

**G.      The CARES Act Does Not Bar Application of Section 120.110(p).**

Plaintiff also incorrectly argues that the CARES Act does not allow reliance on section 120.110(p) to deny them eligibility under the PPP.  This argument is addressed in full above at Point I(D) in relation to 13 C.F.R. § 120.110(n).

**H.      Plaintiff Has Not Sought A Ruling That It Is Not Subject to 13 C.F.R. § 120.110(p)**

The district court in *Camelot* – a case heavily relied upon by Plaintiff -- held that the *Camelot* plaintiffs were not engaged in a business that "present[s] live performances of a prurient sexual nature," as set forth in 13 C.F.R. § 120.110(p), and have thus shown that they are not forbidden from receiving an SBA loan under § 120.110(p).  *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, No. 20-C-0601, 2020 WL 2088637, at * 5-6 (E.D. Wis. May 1, 2020).

This Court should not adopt this ruling for two reasons.  First, this Plaintiff does not argue in its Complaint or in its preliminary injunction motion that it is entitled to PPP loans because the regulation by its terms does not apply to it; i.e.: that its business is not of a "prurient" sexual nature.

---

[11] Plaintiff's "occupational liberty" argument also lacks merit.  Whatever the law may have been in 1897, *Allgeyer v. St. of La.*, 165 U.S. 578 (1897)), the Seventh, Eleventh, and Eighth Circuits agree that "claims alleging the deprivation of occupational liberty are [no longer] cognizable under substantive due process." *Machoka v. City of Collegedale*, 2019 WL 1768861, at *5 (E.D. Tenn. Apr. 22, 2019) (citations omitted).  And even if the Supreme Court's contemporary jurisprudence of substantive due process still recognized a right of occupational liberty, it would also still be the case that a "decision not to subsidize the exercise" of such a right would "not infringe the right." *Rust*, 500 U.S. at 193.

Rather, Plaintiff argues that the regulation should be enjoined or invalidated as applied to it because it violates its First and Fifth Amendment rights, or because the SBA lacked authority to promulgate the regulation. *See* Dkt. # 1, 3-6.  Second, the *Camelot* court, sua sponte, questioned whether the regulation encompasses "semi-nude dancing," because at least some of the *Camelot* plaintiffs' businesses are required by local ordinance to wear "at least pasties and G-strings."  *Camelot Banquet Rooms*, 2020 WL 2088637, at * 6.  But the regulation does not make any distinction between "fully" and "semi" nude dancing; it restricts SBA small-business loans to businesses that "[p]resent live performances of a prurient sexual nature." 13 C.F.R. § 120.110(p). Even if dancers at Plaintiff's establishment wear certain materials in accordance with local law to make the dancing "slightly less graphic," Plaintiff's business is nonetheless licensed to offer live performances that are explicitly intended to be "erotic," *Barnes v. Glen Theater, Inc.*, 501 U.S. 560, 571 (1991), and the regulation applies. *See* 61 Fed. Reg. 3226, 3240 (Jan. 31, 1996) (final rule); 60 Fed. Reg. 64356, 654360 (Dec. 15, 1995) (proposed rule) (the SBA determined it would "not provide financial assistance to small businesses which present live performances of a prurient sexual nature," such as businesses that feature "nude dancing," because it considered such a restriction "to be consistent with [the SBA's] obligation to direct its limited resources and financial assistance to small businesses in ways which will best accomplish SBA's mission, serve its constituency, and serve the public interest.").

**I.      The Small Business Act Provides That "No Injunction" Shall Issue Against the SBA.**

Plaintiff is also unlikely to succeed on the merits of its claims because Congress has restricted the availability of injunctive relief against the SBA. Specifically, the Small Business Act provides that the SBA may:

> sue and be sued in any court of record of a State having general jurisdiction, or in any United States District Court, and jurisdiction is conferred upon such district court to

determine such controversies without regard to the amount in controversy; *but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the [agency] or [its] property[.]*

15 U.S.C. § 634(b)(1) (emphasis added); *see Keita v. SBA*, No. 07-CV-4958 ENV/LB, 2010 WL 395980 (E.D.N.Y. Feb. 3, 2010) (Vitaliano, J.).

In *Ketia*, the Court examined plaintiff's claim of civil rights violations and whether the SBA's denial of plaintiff's applications for SBA disaster loans was "tainted by unconstitutional discrimination." *Id.* In so doing, the Court held it lacked subject matter jurisdiction to "review and reverse SBA's denial of [plaintiff's] loan applications and order SBA to approve them instead" because the "Small Business Act expressly denies the Court subject matter jurisdiction to review the SBA loan denial decisions." *Id., but see e.g. DV Diamond Club*, 2020 WL 2315880 at *13-14. Several other courts have interpreted section 634(b)(1) to preclude injunctive or any similar relief against the SBA, *see, e.g., Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1290 (5th Cir.1994); *Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir.1990) (explaining that "courts have no jurisdiction to award injunctive relief against the SBA"), although others have held that this provision does not necessarily bar injunctions against the SBA in all circumstances, *see, e.g., Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1056–57 (1st Cir. 1987).

Here, it is unnecessary to resolve questions surrounding the statute's reach at this time, because, as set forth in this memorandum of law, Plaintiff has failed to show that a preliminary injunction is warranted, regardless of whether it is precluded by section 634(b)(1). Nevertheless, this provision casts still further doubt, if any were needed, on the likelihood of Plaintiff's success in this case. *See AAPC*, 2020 WL 1935525 at *5-6; *see also Diocese of Rochester*, 2020 WL 3071603, at *11 ("because the Court concludes that the standard for issuance of a preliminary injunction has not been met, it need not and does not resolve this issue," of whether injunctive relief is available against the SBA).

36

## POINT IV

## PLAINTIFF HAS NOT ADDUCED EVIDENCE OF
## IRREPARABLE HARM.

"Plaintiffs seeking preliminary injunctive relief must affirmatively demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  Veramark Techs., Inc. v. Bouk, 10 F. Supp. 3d 395, 400 (W.D.N.Y. 2014) (citations and internal quotation marks omitted).  "The movant is required to establish not a mere possibility of irreparable harm, but that it is 'likely to suffer irreparable harm if equitable relief is denied."  Veramark Techs., Inc., 10 F. Supp. 3d at 400 (citations and internal quotation marks omitted).

For example, in *The Diocese of Rochester*, Judge Wolford found that the Catholic Dioceses

> submissions regarding the financial impact of the COVID-19 pandemic and concomitant ban on church gatherings are vague. Plaintiffs point out that offerings have dropped off precipitously, but they do not state what percentage of their funding comes from parish assessments versus other sources. Plaintiffs further have not claimed that they need PPP funds in order to make payroll—indeed, there is no indication in Plaintiffs' papers that they have not paid their employees' salaries or that failure to obtain PPP funds would somehow cause Plaintiffs to cease to operate.

*Id.* at * 11; *see also AAPC*, 2020 WL 1935525 at * 6 ("[t]he affidavits in this case contain mostly conclusory statements about the financial hardships the affiants are facing. … The Court has no way of measuring whether these hardships are imminent and irreparable without access to more detailed financial documentation. As such, this factor also weighs in defendants' favor.").

Here, Plaintiff's request for a preliminary injunction must also be denied because it has not presented any evidence, by affidavit or otherwise, of irreparable harm.  Plaintiff contends that absent relief it will surely suffer the ruination of its businesses.  But Plaintiff does not submit even

a scintilla of evidence to substantiate that assertion.[12]  Moreover, Plaintiff's delay in seeking a PPP loan – the CARES Act was passed on March 27, 2020 and additional funds were allocated for the PPP program on April 24, 2020, yet Plaintiff did not apply for a PPP loan until May 20, 2020 (Dkt. # 3-5, ¶ 3) -- also militates against a finding of irreparable harm.  *Matter of Defend H2O v. Town Bd. of the Town of E. Hampton*, No. CV15CV2349ADSAYS, 2015 WL 12564207, at *15 (E.D.N.Y. Oct. 15, 2015), *report and recommendation adopted sub nom.*, 147 F. Supp. 3d 80 (E.D.N.Y. 2015); *see also* Citibank N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) ("Delay in seeking enforcement of … rights, however, tends to indicate at least a reduced need for" preliminary injunctive relief).

## POINT V

## A PRELIMINARY INJUNCTION WOULD BE CONTRARY TO THE PUBLIC INTEREST

Finally, to obtain preliminary injunctive relief in a case against the Government, Plaintiff must show that an injunction prohibiting application of section 120.110(p) under the PPP would be in the public interest.  *Nken*, 556 U.S. at 435.  Plaintiff cannot make that showing, because, as explained in detail above, Congress has already determined that the SBA should continue to apply the restrictions on eligibility codified under section 120.110 when administering the PPP.

Plaintiff offers no justification for disturbing that legislative judgment.  Plaintiff invokes the public interest in free expression but section 120.110(p) does not interfere with their freedom

---

[12] While the loss of First Amendment freedoms, for even minimal periods of time, can constitute an injury, that theory of injury pre-supposes that Plaintiff has established a likelihood of success on the merits of its First Amendment claims.  *See ACLU of Ky. v. McCreary Cty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (explaining that under *Elrod* a finding of irreparable injury is mandated "*if* it is found that a constitutional right is being threatened or impaired") (emphasis added), *aff'd on other grounds*, 545 U.S. 844 (2005).  For the reasons already discussed, however, Plaintiff's constitutional claims have no merit.  Thus, Plaintiff failed to demonstrate an injury entitling it to preliminary relief.

of speech.  *See AAPC*, 2020 WL 1935525 at *6-7.  If the public interest in free expression did not warrant preliminary relief on behalf of political consultants and lobbyists, *see id.,* whose speech lies at "the core of the protection afforded by the First Amendment," *McIntyre*, 514 U.S. at 346, then surely it does not compel relief on behalf of topless female performance dance entertainment, which lies at the "outer perimeters" of protected speech, *Barnes*, 501 U.S. at 565–66.  *See also Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 61 (1976).

## POINT VI

## IF THE COURT GRANTS INJUNCTIVE RELIEF, THEN PLAINTIFF SHOULD POST BONDS

If the Court were to grant a preliminary injunction (which it should not), the injunction should only require the SBA to continue to reserve guarantee authority for Plaintiff.  At the preliminary injunction stage, the Court should not require SBA to transmit loan authorization numbers to Plaintiff's lending institution, resulting in disbursement of the loan proceeds to Plaintiff that the SBA may never succeed in recouping.

If the Court nevertheless were to order provisional relief resulting in the disbursement of PPP loans guaranteed by the SBA, the Court should require Plaintiff to post bonds.  Courts may issue injunctions "only if the movant gives security.'"  Fed. R. Civ. P. 65(c).  Here, SBA would suffer pecuniary injury if, after the issuance of a preliminary injunction, the agency ultimately prevailed on the merits yet could not recover from Plaintiff the loan proceeds they had already spent.  Injunctive relief in this case, therefore, should be predicated on Plaintiff posting bonds to cover the full amount of the SBA's guarantees on their loans.  *See, e.g.*, *Roche Diagnostics Corp. v. Med. Automation Sys., Inc.,* 646 F.3d 424, 428 (7th Cir. 2011).

## **CONCLUSION**

For the reasons above, Plaintiff's motion for preliminary injunction should be denied and defendants' motion should be granted.

DATED:   Buffalo, New York, June 15, 2020.

JAMES P. KENNEDY, JR.
United States Attorney


BY:   /s/MICHAEL S. CERRONE
Assistant U.S. Attorney
U.S. Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716-843-5851
michael.cerrrone@usdoj.gov